# SIXTH DISTRICT COURT OF APPEAL
## STATE OF FLORIDA

_____

Case No. 6D2023-2409
Lower Tribunal No. 2019-CA-010941-O

_____

IAN DAVID HARRISON,

Appellant,

v.

NC3 SYSTEMS, INC., d/b/a CALIVA,

Appellee.

_____

Appeal pursuant to Fla. R. App. P. 9.130 from the Circuit Court for Orange County.
John E. Jordan, Judge.

October 14, 2024

STARGEL, J.

Ian David Harrison appeals the denial of his motion to dismiss for lack of personal jurisdiction.[1]  Harrison argues the trial court erred by failing to apply the corporate shield doctrine since the only evidence suggested that all of his contacts with the State of Florida were in his corporate capacity, and no evidence suggested that he

_____

[1] We have jurisdiction. *See* Fla. R. App. P. 9.130(a)(3)(C)(i).

engaged in fraud or intentional torts directed at the state either individually or in his corporate capacity. We agree and reverse.

## Background

The underlying action was brought by NC3 Systems, Inc. d/b/a Caliva ("Caliva"), against numerous defendants alleging the misappropriation of funds exceeding $500,000. Caliva is a California corporation in the business of manufacturing, distributing, and retailing cannabis products. In September 2018, Caliva contracted with Compliance Financial Network, LLC ("CFN"), to provide banking and payment processing services. Among other things, their agreement provided that CFN or its agents would assist Caliva in opening an Federal Deposit Insurance Corporation ("FDIC") insured bank account in Caliva's name to facilitate deposits of the cash receipts Caliva received as part of its daily operations. Prior to contracting with Caliva, CFN executed a joint venture agreement with DirectPay International, LLC ("DPI"), a Florida limited liability company. Harrison, DPI's Chief Technical Officer, helped DPI develop software for CFN's clients in the cannabis industry to access banking and payment processing systems that would otherwise be unavailable due to current federal law.

Shortly after Caliva contracted with CFN, Caliva learned that the bank account CFN opened on Caliva's behalf was held in the name of "DPX," short for DPX Corporate Services, LLC ("DPX"), which was a pass-through company DPI used for

2

issuing payroll checks. When Caliva inquired why its name was not referenced on the account, CFN's Chief Operating Officer, Bryan Efimov, represented that it was standard practice for the account to be held in the name of the payment processor. In November 2018, Caliva's payment system was enabled by CFN and initially appeared to function as intended, but significant problems soon arose. Several wire transfers from the DPX account to Caliva were delayed, were not sent, or had not cleared. Caliva's efforts to resolve these issues with CFN's representatives proved unsuccessful, and by January 2019, the CFN system had ceased functioning as it related to Caliva's ability to access its funds, resulting in Caliva's loss of $527,901.47.

On May 31, 2022, Caliva filed suit in the Ninth Judicial Circuit alleging that numerous defendants, including Harrison, engaged in a conspiracy to defraud and wrongfully retain funds belonging to Caliva. The Amended Complaint alleged that Harrison was a resident of Georgia; that he was conducting business in Maitland, Florida; and that he was a principal of DPI and DPX. Of the five counts in the Amended Complaint, Harrison was included in Count I (violation of the Florida RICO Act), Count II (fraud in the inducement), and Count V (conversion).

Harrison moved to dismiss the Amended Complaint for lack of personal jurisdiction and filed an affidavit attesting that he does not do business in Florida; that he was a member of DPX until its dissolution in September 2020; that although he was named as a manager of DPX, he had no responsibilities for that company; that he was

a manager and the Chief Technical Officer of DPI until sometime in 2017; that his duties on behalf of DPI were limited to ensuring software required by company worked as needed; that he had no management responsibilities on behalf of DPI; that he had no office in Florida; that he did not provide services to DPX in Florida; and that he had "no personal knowledge of any aspects of the allegations of wrongdoing in the Amended Complaint."

In response to Harrison's motion, Caliva provided the affidavit of James Yarbrough, who attested that he and Harrison opened and operated DPI and DPX and that the office for both companies was located at an address in Maitland, Florida. Yarbrough's affidavit described his and Harrison's roles in each company in identical terms: "I served as the Operating Manager and Mr. Harrison served as the Vice-Operating Manager. We each held a 50% ownership interest in the company and both participated in the company's operation and banking." Thereafter, Harrison filed a second affidavit explaining that the Maitland address was a "virtual office" and not a physical address for DPI and DPX; that Yarbrough was in charge of all banking for DPX; that Harrison was told he had been added to DPX's account at a bank in Florida in case of emergency if the company needed to send a wire when Yarbrough was unavailable; and that Harrison sent one wire transfer from that account at Yarbrough's request, but this occurred more than one year before Caliva became a client of CFN.

The parties engaged in limited jurisdictional discovery, after which the trial court held an evidentiary hearing on Harrison's motion. This yielded additional evidence, including testimony from Harrison about his role with DPI and his business travel to Florida, including at least two trips to Florida for meetings concerning DPI. Harrison also testified that he had a three-person software development team, one of whom was based in Florida and worked on projects for DPI and his other companies. Bank records showed that Harrison appeared as the signatory for all checks issued by DPX from its bank account and that he initiated two wire transfers from the account, both of which occurred after Caliva had contracted with CFN.

Yarbrough testified at the hearing about Harrison's role with DPI, which involved creating and maintaining their software and working with Yarbrough to acquire new business. Yarbrough explained that due to Harrison's technical knowledge, Harrison was "involved intimately with many of the business development relationships" and "was always on the call or in the room in order to support our business development efforts." As it pertained to DPI's banking activities, Yarbrough testified that Harrison was "something of a backup" when he was unavailable. Harrison was also integral in developing and handling the day-to-day operation of the "API," which is the interface between the financial institution and DPI's software. Yarbrough also confirmed that DPI was a "virtual company" and that the Maitland address was

5

used for receiving mail and for the company's Sunbiz documents.[2] Yarbrough recalled that Harrison traveled to Florida to attend "10 to 12, maybe more" in-person meetings to discuss business related to DPI and DPX.

Following the hearing, the trial court entered an order denying Harrison's motion to dismiss. The trial court found that the Amended Complaint included sufficient allegations to subject Harrison to personal jurisdiction under section 48.193(1)(a)1, Florida Statutes (2022), for engaging in business in the State of Florida. After considering the affidavits and evidence presented at the hearing, the trial court concluded that personal jurisdiction had been established based on Harrison's "extensive business activity" in the state.

Analysis

This Court reviews an order finding personal jurisdiction over a nonresident defendant de novo. *See Travel Ins. Facilities, PLC v. Naples Cmty. Hosp., Inc.*, 367 So. 3d 611, 615 (Fla. 6th DCA 2023). To determine whether personal jurisdiction exists over a nonresident defendant, courts must apply the two-step analysis established in *Venetian Salami Co. v. Parthenais*, 554 So. 2d 499 (Fla. 1989). First, the court determines whether "the complaint alleges sufficient jurisdictional facts to bring the action within the ambit of the [long-arm] statute; and if it does, the next inquiry is

---

[2] Sunbiz is the official website for the Florida Department of State, Division of Corporations.

whether sufficient 'minimum contacts' are demonstrated to satisfy due process requirements." *Id.* at 502 (quoting *Unger v. Publisher Entry Serv., Inc.*, 513 So. 2d 674, 675 (Fla. 5th DCA 1987)).

The plaintiff bears the initial burden to allege a basis for personal jurisdiction under the long-arm statute. *Hilltopper Holding Corp. v. Est. of Cutchin ex rel. Engle*, 955 So. 2d 598, 601 (Fla. 2d DCA 2007) (citing *Venetian Salami*, 554 So. 2d at 502). "A defendant wishing to contest the allegations of the complaint concerning jurisdiction or to raise a contention of minimum contacts must file affidavits in support of his position. The burden is then placed upon the plaintiff to prove by affidavit the basis upon which jurisdiction may be obtained." *Venetian Salami*, 554 So. 2d at 502. If the affidavits can be harmonized, the court can decide the jurisdictional issue based on the undisputed facts. *Id.* at 502-03. However, if the affidavits cannot be harmonized, the trial court must hold a limited evidentiary hearing to determine the jurisdictional issue. *Id.* at 503.

Caliva alleged the existence of personal jurisdiction pursuant to section 48.193(1)(a)1, which provides for personal jurisdiction when a cause of action arises from the defendant "[o]perating, conducting, engaging in, or carrying on a business or business venture in this state or having an office or agency in this state," and section 48.193(1)(a)2, which provides for jurisdiction when a defendant "[c]ommit[s] a tortious act within the state." The Amended Complaint alleged: "Defendants

misappropriated Caliva's funds in this Circuit, the DPI Defendants' principal place of business is located in this Circuit, and the CFN Defendants have conducted substantial business with the DPI Defendants in this Circuit."[3]  The Amended Complaint also alleged that Harrison "was conducting business in Maitland, Florida[,] and is a principal of DPI and DPX."

"The question of whether a nonresident is 'doing business' or 'engaged in a business venture' in Florida depends on the unique facts presented in each case." *Kapila v. RJPT, Ltd.*, 357 So. 3d 241, 246 (Fla. 2d DCA 2023) (citing *James v. Kush*, 157 So. 2d 203, 205 (Fla. 2d DCA 1963)).  To meet the requirements of section 48.193(1)(a)1, "the defendant's activities 'must be considered collectively and show a general course of business activity in the state for pecuniary benefit."  *Id.* at 247 (quoting *April Indus., Inc. v. Levy*, 411 So. 2d 303, 305 (Fla. 3d DCA 1982)).

As to personal jurisdiction under section 48.193(1)(a)2, "courts have looked to whether the nonresident defendant 'committed a substantial aspect of the alleged tort in Florida.'" *NHB Advisors, Inc. v. Czyzyk*, 95 So. 3d 444, 448 (Fla. 4th DCA 2012) (quoting *Watts v. Haun*, 393 So. 2d 54, 56 (Fla. 2d DCA 1981)).  In *Wendt v. Horowitz*, 822 So. 2d 1252, 1260 (Fla. 2002), the supreme court held that a defendant's physical presence is not required to "commit a tortious act" and that jurisdiction can be

---

[3] The Amended Complaint defined "DPI Defendants" as including DPI, DPX, Harrison, and Yarbrough.

established "through the nonresident defendant's telephonic, electronic, or written communications into Florida" if "the cause of action . . . arise[s] from the communications." However, as subsequent decisions have observed, "the *Wendt* rule is applied when the tort 'involves some sort of communication directed into Florida for purpose of fraud, slander, or other intentional tort.'" *Robinson Helicopter Co., Inc. v. Gangapersaud*, 346 So. 3d 134, 140 (Fla. 2d DCA 2022) (quoting *Stonepeak Partners, LP v. Tall Tower Cap., LLC*, 231 So. 3d 548, 554 (Fla. 2d DCA 2017)).

In his motion to dismiss, Harrison argued that his ownership interest in DPX and his official actions on the company's behalf, without more, were insufficient to establish personal jurisdiction under the long-arm statute. Harrison's affidavit denied that he did any business, provided any services, or had an office in Florida and attested that he had no personal knowledge of the wrongdoing alleged in the Amended Complaint. The burden then shifted to Caliva, which submitted Yarbrough's affidavit attesting to Harrison's involvement in both companies and the location of their office in Maitland. After considering the affidavits and evidence from the evidentiary hearing, the trial court found that personal jurisdiction had been established over Harrison based on his "extensive business activity" in Florida.

On appeal, Harrison argues that the trial court is barred from exercising personal jurisdiction over him based on the corporate shield doctrine. Under the corporate shield doctrine, the actions of a corporate employee in a representative capacity do not form

9

the basis for jurisdiction over the corporate employee in their individual capacity. *Doe v. Thompson*, 620 So. 2d 1004, 1006 (Fla. 1993); *see also Carter v. Est. of Rambo*, 925 So. 2d 353, 356 (Fla. 5th DCA 2006) ("The corporate shield doctrine draws a distinction between a corporate officer acting on his own and a corporate officer acting on behalf of his corporation. . . . [A]ny activity in one's capacity as a corporate officer or director is exempted from consideration in support of the exercise of long-arm jurisdiction over said officer or director."). "The rationale of the doctrine is 'the notion that it is unfair to force an individual to defend a suit brought against him personally in a forum with which his only relevant contacts are acts performed not for his own benefit but for the benefit of his employer.'" *Doe*, 620 So. 2d at 1006 (quoting *Estabrook v. Wetmore*, 529 A.2d 956 (N.H. 1987)). The doctrine applies equally to nonresidents who act in a representative capacity on behalf of a limited liability company. *Rensin v. State, Off. of Atty. Gen., Dep't of Legal Affs.*, 18 So. 3d 572, 574 n.1 (Fla. 1st DCA 2009) (citing *Stomar, Inc. v. Lucky Seven Riverboat Co.*, 821 So. 2d 1183, 1187 (Fla. 4th DCA 2002)).

As an exception to the corporate shield doctrine, the supreme court in *Doe* recognized that "[a] corporate officer committing fraud or other intentional misconduct can be subject to personal jurisdiction." *Doe*, 620 So. 2d at 1006 n.1. Florida courts have interpreted this exception as requiring the defendant to have personally and intentionally engaged in tortious conduct that was "calculated to inflict a direct injury

10

upon a resident of Florida." *Rensin*, 18 So. 3d at 576 (Fla. 1st DCA 2009); *see also LaFreniere v. Craig-Myers*, 264 So. 3d 232, 239 (Fla. 1st DCA 2018) ("[T]he conduct alleged must consist of intentional and tortious acts 'expressly aimed at' Florida, with knowledge by the defendant that it 'would have a potentially devastating impact' upon the victim." (quoting *Calder v. Jones*, 465 U.S. 783, 783-84 (1984))); *Oesterle v. Farish*, 887 So. 2d 412, 415 (Fla. 4th DCA 2004) (holding that personal jurisdiction was proper where corporate employee "committed an intentional tort in Florida against a Florida resident"); *Allerton v. State Dep't of Ins.*, 635 So. 2d 36, 39 (Fla. 1st DCA 1994) (holding that corporate shield doctrine did not apply where corporate employee committed intentional torts aimed at Florida company).

In *Kitroser v. Hurt*, 85 So. 3d 1084, 1090 (Fla. 2012), the supreme court further recognized that "[w]here an individual, nonresident defendant commits negligent acts in Florida, whether on behalf of a corporate employer or not, the corporate shield doctrine does not operate as a bar to personal jurisdiction in Florida over the individual defendant." However, the facts in *Kitroser* and the court's analysis of the jurisdictional question reflect its holding was limited to situations where the defendant commits the alleged tortious act while physically present within the state. In *Kitroser*, it was undisputed that the defendants involved were nonresident corporate employees who allegedly committed tortious acts, through negligent training, supervision, and retention of a truck driver who allegedly caused a fatal collision. Id. at 1086. These

11

actions occurred while the nonresident employees were personally present at a business facility in Bartow. *Id.* In concluding that jurisdiction over the nonresident defendants was proper, the supreme court explained:

> Jurisdiction properly applies to "any person" who commits torts "within this state." § 48.193, Fla. Stat. (2011). To hold otherwise would be tantamount to providing corporate employees with a form of diplomatic immunity and would abolish the legislative goal inherent in adopting a long-arm jurisdictional statute: to provide an in-state forum to hold those responsible who commit negligent acts in Florida. Florida courts have personal jurisdiction over nonresident defendants whose alleged negligent acts occur in-state irrespective of whether these acts occurred for the benefit of a corporate employer.

*Id.* at 1090.

Here, neither Yarbrough's affidavit nor any of the evidence adduced at the hearing showed that Harrison was doing business in Florida in his personal capacity as opposed to his corporate capacity. Nor was there any evidence that Harrison committed any of the tortious acts alleged in the Amended Complaint while he was physically present in the State of Florida. Therefore, unless Caliva can show that Harrison engaged in intentional tortious conduct "expressly aimed at" Florida, the corporate shield doctrine bars the exercise of personal jurisdiction in this case. *See, e.g.*, *LaFreniere*, 264 So. 3d at 238 (holding that corporate shield doctrine barred suit against nonresident corporate officer who regularly visited Florida in her corporate capacity but did not commit a tort within the state); *Carter*, 925 So. 2d at 356 (holding that managing member of entity that owned nursing home was not subject to personal

jurisdiction where there was no evidence that he "personally operated a nursing home in Florida or that he personally committed any tortious acts against [the plaintiff] in Florida").[4]

The Amended Complaint alleged that the defendants, including Harrison, misappropriated Caliva's funds and committed several intentional torts in Florida. Harrison's affidavit refuted these allegations by disclaiming any "personal knowledge of any aspects of the allegations of wrongdoing in the Amended Complaint." Caliva argues that Harrison's affidavit was insufficient to shift the burden to Caliva because Harrison did not deny committing a tortious act or specifically address the allegations concerning the alleged wrongful retention of funds belonging to Caliva. However, at least under the specific circumstances of this case, as it pertains to the *intentional* torts alleged in the Amended Complaint, Harrison's denial of personal knowledge of the alleged wrongdoing was tantamount to a denial of having committed the alleged tortious acts.[5]

The burden thus shifted to Caliva to produce affidavits or other evidence showing that Harrison committed an intentional tort directed at a resident of Florida. Caliva failed to substantiate its allegations of intentional tortious conduct on the part

---

[4] This analysis dovetails with Caliva's other alleged ground for long-arm jurisdiction under section 48.193(1)(a)2 for committing a tortious act in Florida.

[5] Unlike the affidavit in *Acqadro v. Bergeron*, 851 So. 2d 665, 672 (Fla. 2003), Harrison's affidavit provided more than a mere legal conclusion that the conduct at issue was not actionable.

of Harrison, focusing instead on attempting to establish jurisdiction based on Harrison's extensive business contacts with Florida. Nothing in Yarbrough's affidavit or testimony at the evidentiary hearing even purported to rebut Harrison's denial of the tortious conduct alleged in the Amended Complaint. This proves fatal to Caliva's attempt to establish jurisdiction over Harrison, as the sheer volume of Harrison's business contacts with Florida, though well supported by Caliva's evidence, is insufficient to support personal jurisdiction when those contacts were strictly in his corporate capacity and there has been no showing that Harrison engaged in fraud or other intentional tortious conduct.[6]

## Conclusion

In summary, while Harrison may have been less than forthcoming about certain aspects of his involvement with DPI and DPX, his affidavit was sufficient to contest the Amended Complaint's jurisdictional allegations and shift the burden to Caliva. Although Caliva provided evidence of Harrison's extensive business contacts with Florida, those contacts were exclusively in his corporate capacity. Caliva also failed

---

[6] Assuming Caliva had shown that Harrison committed the intentional torts alleged in the Amended Complaint, the record clearly reflects that such conduct was not expressly directed at a resident of Florida. The Amended Complaint alleges that Caliva is a California corporation with its principal place of business in San Jose, California. There is nothing in the record to suggest that Caliva is or was ever a Florida resident corporation. For this reason alone, the intentional torts alleged in the Amended Complaint could not have been "calculated to inflict a direct injury upon a resident of Florida," *Rensin*, 18 So. 3d at 576, and cannot support the exercise of personal jurisdiction under the exception to the corporate shield doctrine.

14

to produce any evidence to establish jurisdiction under the intentional-tort exception to the corporate shield doctrine.[7]  Accordingly, we reverse and remand with instructions for the trial court to render an order dismissing Harrison from the underlying action.

REVERSED and REMANDED with instructions.

SMITH and MIZE, JJ., concur.


H. Clay Parker, of The Florida Lawyer, Orlando, for Appellant.

Ronald P. Ponzoli, Jr., and Ashley Genoese, of GrayRobinson, P.A., West Palm Beach, for Appellee.


NOT FINAL UNTIL TIME EXPIRES TO FILE MOTION FOR REHEARING AND DISPOSITION THEREOF IF FILED

---

[7] Because we conclude that Caliva failed to establish a basis for jurisdiction under the long-arm statute, it is unnecessary to address the second prong of *Venetian Salami*.